## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **Arlene Cannon, and on behalf of her minor daughter, Kara Cannon** )<br>)<br>)<br>) | **CIVIL ACTION** |
| **v.** ) | **NO:    02-CV2657** |
| ) | |
| **National Railroad Passenger Corporation** )<br>**(a/k/a Amtrak)** )<br>)<br>) | **The Honorable James McGirr Kelly** |

---

### DEFENDANT AMTRAK'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

---

Plaintiff Arlene Cannon brings this public accommodations discrimination action against Defendant National Railroad Passenger Corporation (hereinafter "Amtrak") both individually and on behalf of her minor child Kara Cannon to remedy statutory violations they allegedly experienced while traveling by train under Title II of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Amtrak, by its counsel, now moves this Court for judgment on the pleadings or alternatively, for summary judgment in its favor on Plaintiffs' claims in their entirety, on the following grounds.

First, neither Plaintiff meets the statutory definition of a "qualified individual with a disability", although for different reasons. Whether acting individually or based on her relationship with her daughter, Arlene Cannon lacks standing to sue under both the ADA and the Rehabilitation Act. While some courts accord standing to those claimants who sustain a "separate and distinct

injury" because of their association with a disabled person, here Ms. Cannon was not personally denied the benefits of Amtrak's services during her travel.  Thus, she cannot satisfy Article III's requirement under the U.S. Constitution that she sustain an injury-in-fact.

Moreover, while it is undisputed that the minor child Kara Cannon tragically suffers from profoundly disabling physical and cognitive impairments, it is precisely the severity of these conditions that render Plaintiffs incapable of establishing that Kara falls within the statutory definition of a "qualified individual with a disability." Specifically, given Plaintiffs' own allegations concerning Kara's propensity for seizures and inability to move between train cars in her wheel chair through accessible doorways without risk of physical injury,  it is impossible for her to meet the essential eligibility requirements for the receipt of rail passenger services from Amtrak or to travel safely on Amtrak trains.

Second, it is impossible for the Cannons to state a valid claim that Amtrak violated Title II of the ADA or the Rehabilitation Act since Amtrak fully satisfied its duty to reasonably accommodate its wheelchair-bound passengers, including Plaintiff Kara Cannon, thus precluding any finding of inaccessibility.  Nor can they establish either that Amtrak failed to properly train its employees to assist disabled passengers or to maintain an effective complaint system where it is undisputed that Amtrak accomplished both of these goals in complete compliance with federal law. There is no claim that Amtrak discriminated against Kara because of her disability.

Third, Plaintiffs' inability to prove intentional disability discrimination by Amtrak precludes their recovery of compensatory damages. Fourth, Plaintiffs' punitive damages claim is barred as a matter of law by the  Supreme Court's  recent decision in Barnes v. Gorman, 536 U.S. 181 (2002), holding that punitive damages are not recoverable from public entities such as Amtrak under either the ADA or the Rehabilitation Act.

## I.     STATEMENT OF FACTS

On June 10, 2001, Plaintiffs Arlene and Kara Cannon, together with Kara's ten year-old brother Kenneth, traveled on Amtrak Train No. 66 from Newport News, Virginia to Westwood, Massachusetts. See Complaint, ¶¶ 6-7.  Because Kara, then age 13, has cerebral palsy that confines her to a wheelchair, her mother Arlene reserved three seats in the accessible car on the train. Id., at ¶¶ 6-8.[1]  En route to Boston, the train made its twenty-five minute scheduled stop at Union Station in Washington, D.C.[2]  Although  it was not their destination and time was short, the Cannons attempted to disembark, allegedly because Kara could not remain on the train while the air conditioning was turned off during the brief stop without risking a seizure or breathing problems. Id., at ¶¶ 8, 10-11.  A redcap at Union Station allegedly declined Arlene Cannon's repeated requests to detrain and then reboard just a few minutes later by explaining that he needed to use the wheelchair lift[3] elsewhere and he was busy during the short time the train was stopped.  As a result, the Cannons were not able to exit the train at Union Station. Id., at ¶¶ 11-13.

After the train left Union Station, Plaintiff Kara Cannon needed to be fed.  As Plaintiffs admit, the snack car was conveniently located[4] and fully accessible by wheelchair.[5]  Nevertheless, Mrs. Cannon did not even attempt to take Kara to the snack car, with or without assistance from Amtrak on-board service personnel – who receive training in wheelchair handling[6] -- allegedly because "there was no safe way to transport Kara in her chair between cars" since her "bones are

---

[1] See Declaration of Eliza Kelly, hereinafter "Kelly Decl.", Exh. "A". Kenneth Cannon is not disabled, nor is he asserting a claim for damages in this case on any theory.
[2] Kelly Decl., Exh. "B".
[3] Amtrak utilizes a wheelchair lift in Union station, not a ramp as alleged in the Complaint, a fact not material to this Motion.
[4] Complaint, ¶ 14.
[5] Kelly Decl., Exh. "C".
[6] Kelly Decl., Exh. "M", pages 16 - 21.

very small and fragile".[7] Nor did she ask for assistance in ordering food to be served at their seats,

a service Amtrak is happy to provide on request, as advertised both on its website,

www.amtrak.com, and in "Access Amtrak", its guide for disabled passengers.[8] Instead, Mrs. Cannon

asked an Amtrak conductor to microwave a small container of food that she had brought with her.[9]

 Because regulations issued by the Food and Drug Administration ("FDA") prohibit Amtrak

personnel from heating food that passengers bring on board, the conductor understandably declined

to do so and explained why.  See FDA Code § 3-201.11 (A), (B).[10]  While he allegedly did not

volunteer to bring Mrs. Cannon a snack car menu, there are no individual menus for the snack car.

Nor did Mrs. Cannon request further help. [11]

On June 23, 2001, the Cannons began their southbound trip home on Amtrak's Train No. 99,

once again in the train's accessible car. As on their northbound trip, the wheelchair accessible snack

car was located immediately ahead of the Cannons' car and was equipped with an accessible

restroom.  In addition, the two cars ahead of the snack car each had both handicap accessible

restrooms and space in front of seats for wheelchairs.[12]

After the train left New York's Penn Station, the accessible restroom in the Cannon's rail car

had to be closed due to a toilet malfunction. See Complaint, ¶ 17. Mrs. Cannon asked the conductor

to leave the nonfunctioning restroom open, explaining that she only needed the restroom for privacy

[7] Complaint,  ¶ 14.

[8] Kelly Decl., Exh. "D", page entitled "Meal Service"; Exh.  "L",  page 11.

[9] Complaint,  ¶ 14.

[10] Id.  See, Kelly Decl., Exh. "G".  Amtrak's web site, www.Amtrak.com, expressly informs passengers that the FDA precludes on-board service employees from handling any food they bring on board, as does Amtrak's National Timetable. Kelly Decl., Exh. "E"; Exh. "N", section entitled "Food, Beverage and Medication."

[11] Complaint, ¶ 14.

[12] Complaint, ¶ 16. The Cannons rode to Newport News  in  the last of seven rail cars.  The preceding three rail cars each had wheelchair accessible toilets.  Kelly Decl., Exhs. "A", "H.

purposes to change Kara's diapers. Id.  Because of the obvious health risk posed by the toilet overflow, the conductor quite reasonably refused. Mrs. Cannon then allegedly asked the conductor if there was some other car they could move to.  According to Plaintiffs, no help was offered. Id. Given Mrs. Cannon's previous refusal to move Kara between cars due to her allegedly fragile bones,[13] such an offer seemingly would have been futile.

Rather than go into the next car ahead where an accessible bathroom was available for her use, Mrs. Cannon instead elected to change her daughter's diaper on the floor of the rail car they were in, and asked a conductor for a blanket for privacy. Because Amtrak does not carry any passenger blankets on its East Coast regional trains, she was told no blankets were available.[14]

According to the Complaint, Kara was changed eight times in this manner between New York and Newport News, on the blanket Mrs. Cannon brought with her.[15] Plaintiffs further allege that she had no place to dispose of Kara's soiled diapers because the trash receptacles on their car were full. While Plaintiffs allege that Mrs. Cannon got no help from the conductors to either empty the trash receptacles on her car or to take the soiled diapers off the train, they do not assert that she asked for such assistance.  Nor do Plaintiffs suggest that all of the trash receptacles on all seven train cars were full. Id., at ¶ 23.

Upon arriving once again at Washington Union Station on their return trip, Mrs. Cannon again asserted that they wanted to leave the train and reboard during the brief stop, once again because the air conditioning would be turned off and to dispose of Kara's diapers.  The Union Station redcap allegedly told her that the wheelchair lift she had requested was unavailable and did

---

[13] Complaint, ¶¶ 6, 14.
[14]  Complaint, ¶ 19. Nor were there sleeping cars on Train 99 from which blankets could be obtained. Kelly Decl., para. 10, Exh. "H".
[15] Complaint,  ¶¶ 19-20.

not directly respond to her question as to whether the ramp was in use.[16]

After the train left Union Station, a conductor informed Mrs. Cannon that her nondisabled son would have to move to another seat six or seven rows back within their car to make room for a newly boarded passenger with a disability who had reserved space in one of the accessible seats. Rather than move him because she believed it was not "proper", however, Mrs. Cannon placed her ten year-old son on her lap for the next one to two hours until the visibly disabled passenger occupying Kenneth's previous seat disembarked.[17]

When the train reached the Newport News station, it was raining and the wheelchair ramp got stuck halfway down to the platform. According to Plaintiffs, no one was there to help them off the train. Complaint, ¶ 27.

In response to Mrs. Cannon's attempts to report their dissatisfaction with Amtrak service on both the northbound and southbound train trips, Plaintiffs allege that Amtrak failed to send them a complaint form as promised.[18] However, Plaintiffs admit that the Company did respond to Mrs. Cannon's expressed concerns in writing, expressing regret that their recent trip did not meet her expectations or Amtrak's.[19] Plaintiffs neglect to mention that Amtrak issued them a service credit equal to the entire cost of their round trip train fare for three, in the amount of $165.00, just two days after their trip ended, on June 25, 2001.[20]

## II.    ARGUMENT

### A.  The Standard for Judgment on the Pleadings

---

[16] Complaint, ¶¶ 24-25.
[17] Id., at ¶ 26.
[18] Id., at ¶¶ 15, 28.
[19] Id. at ¶ 29.
[20] Kelly Decl., Exhs. "J", "K".

Federal Rule of Civil Procedure 12 (c) requires the entry of judgment on the pleadings where the movant establishes that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. <u>Regalbuto v. City of Philadelphia</u>, 937 F. Supp. 374, 376 (E.D. Pa. 1995), <u>aff'd.</u>, 91 F.3d 125 (3d Cir. 1996), citing <u>Institute for Scientific Info. v. Gordon & Breach, Science Pub., Inc.</u>, 931 F.2d 1002, 1005 (3d Cir. 1991). Far from being disfavored, a motion for judgment on the pleadings "has utility when all material factual allegations are admitted in the pleadings and only questions of law remain." <u>Institute for Scientific Info.</u>, 931 F.2d at 1005; 5A Charles Wright & Arthur R. Miller, Federal Practice & Procedure § 1367, at 510 (2d ed. 1990).

## B. <u>The Summary Judgment Standard</u>

Federal Rule 12 (c) expressly provides that if matters outside the pleadings are presented to and not excluded by the court on a motion for judgment on the pleadings, the motion shall be treated as a motion for summary judgment and disposed of under Federal Rule of Civil Procedure 56.

Rule 56 requires that summary judgment be entered where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Arnold Pontiac-GMC, Inc. v. General Motors Corp.</u>, 786 F.2d 564, 568 (3d Cir. 1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (citation omitted).

The substantive law identifies which facts are material. <u>Liberty Lobby</u>, 477 U.S. at 248.

Only disputes over facts which are outcome determinative under the applicable substantive law will preclude the entry of summary judgment. Id. at 256.  A genuine issue of fact is one which creates a genuine issue for trial.  Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  It is " more than some metaphysical doubt as to the material facts."  Id.

Once the movant presents evidence showing the absence of any material fact, the nonmoving party must present affirmative evidence sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322;  Popko v. Penn State Univ., 994 F. Supp. 293, 296 (M.D. Pa. 1998), citing Liberty Lobby, 477 U.S. at 248.

The non-moving party may not rest on the mere allegations contained in the complaint, but must designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324;  Horth v. General Dynamics Land Systems, Inc., 960 F.Supp. 873, 876 (M.D. Pa. 1997). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." Matushita, 475 U.S. at 587.

The subjective beliefs of the plaintiff are not sufficient to create a genuine issue of material fact. McMillian v. Svetanoff, 878 F.2d 186, 190 (7th Cir. 1989). Summary judgment is proper, even if issues such as motive and intent are at stake, where the party alleging intentional misconduct presents no evidence of motive or intent supportive of their position. See, e.g., Powers v. Dole, 782 F.2d 689, 694 (7th Cir. 1986); Munson v. Friske, 754 F.2d 683, 690 (7th Cir. 1985); Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1313 (7th Cir. 1989).

Taking a disability discrimination case away from the jury is never a decision to be made lightly. However, where, as here, there is simply no evidence of actionable conduct, summary judgment is not only appropriate -- it is required by Federal Rule of Civil Procedure 56.  As the Supreme Court has

recognized:

> Rule 56 must be construed with due regard not only for the right of
> persons asserting claims and defenses that are adequately based in fact
> to have those claims and defenses tried to a jury, but also for the rights
> of persons opposing such claims and defenses to demonstrate . . . that
> the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327.

### C.  Plaintiff Arlene Cannon Lacks Standing to Assert a Disability Discrimination Claim Under Either the ADA or the Rehabilitation Act.

While both Title II of the ADA and the Rehabilitation Act prohibit discrimination against the disabled, these protections extend only to "qualified individuals with disabilities."  See 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794 (a) (Rehabilitation Act). Here, Plaintiff Arlene Cannon is the mother of a severely disabled minor child, Plaintiff Kara Cannon, but is not disabled herself. (Complaint, ¶ 4.) Accordingly, Mrs. Cannon lacks standing to sue under both of these statutes, and her individual claims must be dismissed with prejudice.

While some courts have accorded parents of disabled children associational standing under the ADA under certain extremely limited circumstances based upon their *relationship* to a "qualified person with a disability", the requisite "specific, direct and separate injury" is lacking here.  See W.G. Nichols, Inc. v. Ferguson, 2002 U.S. Dist. LEXIS 10707, at 33-38 (E.D. Pa. 2002);  Glass v. Hillsboro School District, 142 F. Supp. 2d 1286, 1288 (D. Or. 2001); Micek v. City of Chicago, 1999 U.S. Dist. LEXIS 16263, 1999 WL 966970 at 3-4 (N.D. Ill. 1999). Specifically, Mrs. Cannon does not contend that she personally was denied the benefits of any Amtrak service and was thereby damaged in some way because of her relationship to Kara.  Accordingly, she cannot satisfy the "injury-in-fact" requirement imposed by Article III of the U.S. Constitution. See Liberty Resources, Inc. v. SETPA, 155 F. Supp. 2d

242, 248 (E.D. Pa. 2001), citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). The

Supreme Court has long held that a party "cannot rest his claim to relief on the legal rights or interests

of third parties." <u>Warth v Seldin</u>, 422 U.S. 490, 499 (1975).

    The federal courts have not hesitated to deny standing to parents who assert their own claims

arising out of discrimination against their disabled children. For example, in <u>Simenson v. Hoffman</u>, 1995

U.S. Dist. LEXIS 15777, 1995 WL 631804 (N.D. Ill. 1995), the parents of a two-year old boy denied

treatment due to a rare skin disorder brought an ADA discrimination claim against their doctor, arguing

that the denial of medical services to their child constituted a separate and distinct denial of services to

them, in that they were barred from the medical center based on their son's disability.  <u>Id.</u> at 6. The

district court rejected the parents' theory of separate injury and dismissed their claim, reasoning that:

> Denial of admission to a movie theater or a hotel constitutes a separate injury because the
> companion is denied the use of the service or facility.  The [parents] were not at the medical
> center for any purpose other than to seek treatment for Jonathan.  Jonathan's ejection, and that
> of his parents, was merely the final act in the decision to deny him medical treatment.  The
> [parents'] claim for associational discrimination must be dismissed.

<u>Id.</u>  <u>See</u> <u>also</u>, <u>Glass v. Hillsboro School District</u>, 142 F. Supp. 2d 1286, 1289, 1292 (D. Or. 2001) (ADA

and Rehabilitation Act claims brought by parents of autistic children against their school district based

upon the alleged denial of benefits to them personally due to their children's disabilities dismissed: "The

parents have not alleged any separate and distinct denial of services to them, apart from their role as

parents of children enrolled or proposed to be enrolled in defendant's programs. . . . [T]heir attempt to

gain access for their experts to the special education classroom related solely to their children's

education, and was not an attempt to exercise some independent and separate right to have access to the

classroom for their own benefit.")

    Here, Mrs. Cannon does not contend that she was denied access to a restroom, food service or

the snack car because of her daughter's disability.  She does not allege that she personally was not

allowed to leave the train when she needed to, since the only reason for detraining at Union Station was her daughter's alleged breathing problems and susceptibility to seizures.  Nor can Mrs. Cannon allege that she was forced to move from her seat due to alleged "overbooking" of the accessibility car, as it was Kenneth Cannon, her nondisabled minor son, who was asked to move and whose seat was occupied by another visibly disabled passenger.

In short, Mrs. Cannon has no standing to assert an *associational discrimination* claim under either Title II of the ADA or Rehabilitation Act, because she did not suffer any "separate and distinct" injury based on her relationship to her daughter.  Accordingly, here individual claims are subject to dismissal as a matter of law.

### D.  Because Kara Cannon's Disabilities Preclude Her from Satisfying the Essential Eligibility Requirements for Traveling Safely on Amtrak Trains, Plaintiffs Cannot Establish that She Is a Qualified Individual With a Disability Under Either the ADA or the Rehabilitation Act.

According to the Complaint, Plaintiff Kara Cannon suffers from severe mobility, vision and speech disabilities that confine to a wheelchair. (Complaint, ¶ 6.)  "She is very tiny and her bones are very fragile." (Id.) Indeed, her bones allegedly are so small and fragile that there is "no safe way to transport Kara in her chair between [train] cars", even into the fully accessible and conveniently located snack cars on both their northbound and southbound train trips.  (Complaint, ¶ 14; Kelly Decl., Exhs. "C", "H".)  In addition, Kara cannot go without air conditioning for more than 40 minutes without risking seizures and breathing difficulties.  (Complaint, ¶ 8.)

These acknowledged physical limitations preclude Kara from safely traveling on Amtrak trains.  Specifically, were there a fire or some other emergency that required the evacuation of passengers from one train car to another, Kara either would be trapped in the car or run the risk of serious physical injury to escape because she is "too fragile" to be moved in her wheelchair between train cars. Moreover, were

there to be a loss of electrical power either en route or during a brief station stop such as Plaintiffs themselves experienced at Washington Union Station, Kara could have a seizure due to the lack of air conditioning. It is not always possible for everyone to detrain and reboard during short stops. As anyone who travels the Northeast Corridor knows, Amtrak trains periodically do lose power and run between stations without heat or air conditioning for brief periods.

Amtrak cannot be forced to assume responsibility for what might happen to Kara should these kinds of extenuating circumstances arise under either the ADA or the Rehabilitation Act. A railroad simply is not equivalent to an ambulance service. Indeed, Amtrak is required to provide train service and other associated benefits only to "qualified individuals with disabilities." See 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794 (a) (Rehabilitation Act). The term "qualified individual with a disability" is defined as:

> **an individual with a disability who**, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, **meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.**

See 42 U.S.C. § 12131(2) (emphasis added).

Where, as here, the plaintiff cannot meet the essential eligibility requirements for safe travel on Amtrak trains, she is not a "qualified individual with a disability" entitled to protection under the ADA or the Rehabilitation Act, even though she may be profoundly physically and/or mentally disabled. See, e.g., Easley v. Snider, 36 F.3d 297, 300 (3d Cir. 1994) (applying precedent under both the ADA and the Rehabilitation Act, held: disabled plaintiffs ineligible for participation in program designed to enable physically disabled persons to live in their homes rather than institutions due to inability to satisfy requirement that they be mentally alert.)  Accordingly, Plaintiffs' claims are subject to dismissal with

prejudice on this additional ground.

> **E. Even if Plaintiffs Were Entitled to Protection Under the ADA or the Rehabilitation Act, Their <u>Discrimination Claims Remain Subject to Dismissal</u>.**

Even if Plaintiffs could establish that either one or both of them were "qualified individuals with disabilities", they still must bear the burden of proving the following elements in order to make out an actionable disability discrimination claim under either Title II of the ADA or the Rehabilitation Act: 1) they were excluded from participation in or denied the benefits of services, programs or activities provided by a public entity or recipient of federal funding, or were otherwise discriminated against by the entity; and 2) that such exclusion, denial of benefits, or discrimination was based on their disabilities. <u>National Organization On Disability v. Tartaglione</u>, 2001 U.S. Dist. LEXIS 16731, at 8 (E.D. Pa. June 17, 2002), <u>aff'd</u>, 149 F.3d 1163 (3d Cir. 1998), citing <u>Adelman v. Dunmire</u>, 1997 U.S. Dist. LEXIS 3796 (E.D.Pa. March 28, 1997). [21] This they cannot do.

As the undisputed facts conclusively demonstrate, Amtrak fully satisfied its obligation to Plaintiffs under these statutes to provide "a reasonable accommodation to its disabled passengers, so that they are not disadvantaged by reason of their disability." <u>Jones v. PMBDA</u>, 1999 U.S. Dist. LEXIS 10413, at 18-19 (E.D. Pa. July 9, 1999). Accordingly, it is impossible for Plaintiffs to satisfy their burden of proving that Amtrak intentionally discriminated against them because of Kara's disability in any way in violation of the ADA or the Rehabilitation Act .

> **1. <u>The Alleged Denial of an Accessible Restroom</u>**

---

[21] "It is well established that 'whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same.'" <u>Doe v. Montgomery Hospital</u>, 1996 U.S. Dist. LEXIS 18965, 7 <u>Am. Disabilities Cas</u>. (BNA) 121 (E.D. Pa. 1996), quoting <u>Myers v. Hose</u>, 50 F.3d 278, 281 (4th Cir. 1995); <u>see</u> <u>also</u>, <u>McDonald v. Commonwealth of Pennsylvania Department of Public Welfare</u>, 62 F.3d 92, 94-95 (3d Cir. 1995) (also quoting <u>Myers</u>).

Plaintiffs, in essence, contend that Amtrak's decision to close a single wheelchair accessible restroom constituted *per se* discrimination under Title II of the ADA and the Rehabilitation Act. (Complaint, ¶¶ 17-23, 33, 39 and 43.) See 42 U.S.C. § 12162 (a)(2)(B)(iv).  To the contrary, however, it is undisputed that Amtrak more than fully complied with the "one car per train rule", which is dispositive of their claim.  Under section 12162(a)(1) of the ADA, providers of intercity rail transportation are deemed in compliance with the statute so long as they "have at least one passenger car per train that is readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs ...."  See Wray v. National Railroad Passenger Corp., 10 F. Supp. 2d 1036, 1039 (E.D. Wis. 1998) (summary judgment for Amtrak on passengers' ADA claims where compliance with "one car per train rule" undisputed and plaintiffs presented no evidence of discrimination by reason of their disabilities).

Indeed, on Train No. 99, Amtrak provided not only one but five (5) accessible cars, including a total of five (5) wheelchair accessible restrooms, which more than compensated for the one nonfunctioning toilet.[22] See 42 U.S.C. § 12162 (a)(1).  Mrs. Cannon could have used any of these restrooms to change her daughter's diapers. The availability of additional working wheelchair accessible restrooms, including one in the snack car immediately adjacent to the Plaintiffs' car, conclusively demonstrates that Amtrak adhered to a reasonable accommodation policy despite closing the specific restroom in question. See 42 U.S.C. § 12162 (a)(3)(A)-(D).  Accordingly, their per se discrimination claim fails as a matter of law.

Nor can Plaintiffs satisfy their burden of proving that Amtrak's decision to close an inoperable restroom discriminated against Kara, or was based on her disability. As they admit, Amtrak's decision

---

[22] Kelly Decl., Exh.  "H".

to close the restroom was not based on any discriminatory animus or deliberate indifference toward Kara; rather, the decision was a legitimate, non-discriminatory response to a toilet malfunction. See Wray, 10 F. Supp. 2d at 1039 (to establish an ADA violation, plaintiffs must not only show a discriminatory act but also that the act was committed with a motive or intent to discriminate based on their disabilities).

The only remaining basis for Plaintiffs' accessible restroom claim, therefore, is the conductor's alleged failure to move them to another car, the lack of blankets for Kara's privacy and empty trash receptacles for Kara's soiled diapers. See Complaint, ¶¶ 17, 19 and 23. Assuming these allegations are true, they still fail to support even an inference of discriminatory conduct. There is no allegation that the Amtrak conductor failed to move the Cannons to another railcar because of her disability. In any event, based on Plaintiffs' own allegations, Kara Cannon's alleged fragility precluded her movement between train cars. (Complaint, ¶ 14.) At most, Amtrak's failure to provide blankets or to empty the trash, amounts to poor service that affected all passengers equally, not discrimination. See Wray, 10 F. Supp. 2d at 1039 ("The conductor surely could have handled the situation more adroitly. . . .[h]e behaved toward plaintiffs in a manner that they regarded as unpleasant and intimidating. But . . . he did not violate [the ADA]. Therefore, [Amtrak] did not commit an act of discrimination.")

### 2.    The Accessible Food Service Claim

Plaintiffs allege that Amtrak denied Kara the benefits of its food service during their northbound trip in violation of the ADA and the Rehabilitation Act. (Complaint, ¶ 14.) Because they cannot claim that the dining car was inaccessible by wheelchair, however, it is impossible for them to even suggest that Amtrak discriminated against the disabled by failing to provide access to the snack car's food service. See 42 U.S.C. § 12161 (a)(4). Indeed, Plaintiffs admit that they did not use the snack car only

because Mrs. Cannon thought that it was unsafe to transport the wheelchair one car ahead due to Kara's particularly fragile health condition. (Complaint, ¶ 14.)

The only remaining bases for Plaintiffs' discriminatory food access claim are: 1) Amtrak's policy not to heat food passengers bring on board, and 2) the conductor's inability to give her an individual snack car menu that did not exist. It is undisputed, however, that FDA regulations specifically prohibit Amtrak from heating food brought on board by its passengers. See FDA Code § 3-201.11 (A) and (B).[23] Moreover, there are no individual snack car menus for any passenger. Instead, Amtrak's on-board service personnel will serve food from the snack bar to disabled passengers at their seats upon request, as the Company publicizes on its website and in other hand-outs.[24]

Certainly, it was reasonable for the conductor to assume that if Mrs. Cannon asked only to heat her own food, that Plaintiffs had chosen to forego this service. Even if his assumption were wrong, it is not probative of discriminatory intent. Simply stated, therefore, the undisputed facts conclusively establish that similarly situated passengers were treated in a similar fashion, without regard to disability, and that Amtrak had a procedure in place to reasonably accommodate those who needed and requested assistance in obtaining food from the snack bar.

### 3. Plaintiffs' Inability to Detrain and Reboard During a Brief Interim Stop

Plaintiffs further allege that Amtrak discriminated against them by failing to provide a wheelchair lift for Kara's use so that they could all three detrain and reboard during twenty-five minute scheduled stops at Union Station, Washington, D.C. -- not their final destination.[25]

---

[23] Kelly Decl., Exh. "G".

[24] Kelly Decl., Exh. "D", page entitled "Meal Service"; Exh. "L", page 11.

[25] Their Complaint alleges that a redcap placed an exit ramp next to the Cannons' railcar but left them for another location, telling them he was "too busy a man" to help them disembark. See Complaint, ¶ 11.

As Plaintiffs themselves acknowledge, it takes approximately three (3) to five (5) minutes for Kara to detrain, and an equivalent time period to reboard, for a total of approximately ten (10) minutes.[26] Given the brevity of the scheduled stop, time constraints often mean that redcaps must accord first priority to disabled passengers boarding the train initially and to those for whom Union Station is their final destination. According to Plaintiffs' own allegations, that is what happened here. During their northbound trip on June 10th, the Union Station recap explained to Mrs. Cannon that he needed to go elsewhere with the wheelchair lift and was "too busy" to assist Kara in both detraining and reboarding in only twenty-five minutes.[27] Similarly, on their June 23rd return trip to Newport News, a Union Station redcap told Mrs. Cannon that there was not a lift available for their use.[28]

Federal regulations promulgated under the ADA exempt entities such as Amtrak from having to assist passengers in wheelchairs to disembark "when the lift cannot be deployed." 49 C.F.R.§ 37.167(g). Presumably, this includes circumstances in which, during brief stops, the lift is needed to assist another disabled passenger, or station personnel are assisting disabled passengers in other ways and are not available to operate the lift. As Amtrak informs its passengers on the Company website and in other publications, "[t]here may be a short wait for assistance if there are a large number of passengers or a limited staff, and we appreciate your patience."[29] Accordingly, where as here Amtrak has provided "a reasonable response to the problem of excess demand [for accessible services] . . . the ADA does not give plaintiffs a right to override it." Wray, 10 F.Supp. 2d at 1039.

Train Nos. 66 and 99 each make twenty-eight (28) interim stops between Newport News and Boston. (Kelly Decl., Exh. "B".) It would be physically impossible to guarantee to each disabled

---

[26] Complaint, ¶ 9.
[27] Complaint, ¶¶ 11-12.
[28] Complaint, ¶ 25.
[29] Kelly Decl., Exhs. "D", page entitled "Our Stations"; Exh. "L", page 4.

passenger in a wheelchair that they could both detrain and reboard at each location. Simply stated, the conduct as alleged in the complaint does not rise to the level of actionable discrimination.

4.     **ADA Accessible Seating for Kenneth Cannon,**
         **Who Is Not Disabled**

Plaintiffs seek to impose liability on Amtrak for purported "overbooking" the accessible car in which they rode on their June 23rd return trip, and that Kenneth Cannon, who admittedly is not disabled, was asked to move to another seat to make room for another disabled passenger. (Complaint, ¶ 26.) Once again, these allegations fail to state an actionable claim as a matter of law for several reasons.

First, Kenneth Cannon admittedly is not a "qualified disabled individual" who was denied the benefits of Amtrak's services under either the ADA or the Rehabilitation Act. See 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794 (a) (Rehabilitation Act). Not being disabled himself, he is not entitled thereunder to accessible seating on Amtrak trains because of his relationship to Kara.[30] Second, federal regulations promulgated under the ADA provide that Amtrak "*shall ask*" any nondisabled passenger to move to make room for disabled passengers, although it was not required to enforce such a request and made no attempt to do so with Kenneth. See 49 C.F.R. § 37.167(j)(1), (3). See Complaint, ¶ 26.

Third, neither Kenneth Cannon nor his mother Arlene sustained the requisite "separate and distinct" injury because of Amtrak's alleged "overbooking" sufficient to  support any claim of associational standing under either the ADA or the Rehabilitation Act. Both were provided with seating in the same accessible car for which they had purchased tickets. In fact, Kenneth Cannon never moved to a seat "six or seven rows back". [31] Instead, he sat on Ms. Cannon's lap.  No injury was sustained as

---

[30] Indeed, not even an admittedly disabled passenger has an automatic right under the ADA to occupy accessible seating without a reservation therefor and there are more disabled passengers than accessible seats. See Wray, 10 F. Supp. 2d at 1039.

[31] See Complaint, ¶ 26.

a result. Of course, it would be ludicrous to suggest that Kara suffered any injury because of her disability because her nondisabled brother was asked to move a few seats away.

### 5. <u>Alleged Failure to Implement a Complaint System</u>

Despite the fact that they received a letter of apology from Amtrak's President and a service credit equal to their three round-trip fares within days of arriving home,[32] Plaintiffs surprisingly accuse Amtrak of violating the ADA and the Rehabilitation Act "by failing to have in place an effective system by which persons can complain of service deficiencies and discrimination to the company." <u>See</u> Complaint, ¶¶ 37 and 46. However, neither the ADA, the Rehabilitation Act, nor regulations promulgated thereunder impose any obligation or requirement that a complaint system be implemented. Accordingly, Plaintiffs' allegations fail to state an actionable claim for relief.

In any event, as the undisputed facts conclusively demonstrate, Amtrak does have such a system whereby it invites customer comments, including complaints, regarding its services for disabled passengers in several ways, and responds appropriately through its Customer Relations Department. Specifically, Amtrak provides its patrons with a "Comment" form on its website, www.amtrak.com, where the customer may voice comments or complaints via e-mail, and if they so choose, include identifying information so that the Company may respond.[33] Alternatively, both the website and the "Access Amtrak" guide encourage disabled passengers with questions or problems to call Amtrak's 1-800-USA-RAIL number or, if needed, a TDD/TTY 800 number, which allows them to be referred to a Customer Service Agent.[34] Or, the passenger may telephone Access Amtrak toll free. [35] Of course, passengers always may contact Amtrak's Customer Relations staff via postal mail as stated on the

---

[32] Kelly Decl., Exhs. "J", "K".
[33] Kelly Decl., Exh. "I".
[34] Kelly Decl., Exh. "D", page entitled "Contacting Us To Assist You"; Exh. "L", page 21.
[35] Kelly Decl., Exh. "L", page 21.

website and the Access Amtrak guide, which also includes a "tear out" comment form.[36] Amtrak also instructs its on-board service employees about these various complaint and comment procedures, and encourages them to make every effort to resolve issues as they arise on the train.[37]

Here, Mrs. Cannon's reported Plaintiffs' experiences on both their June 10th and June 23rd trips on one of Amtrak's toll-free 800 numbers and in person to a Newport News ticket agent. (Complaint, ¶¶ 15, 28.) Amtrak promptly responded in writing to Mrs. Cannon's complaints by letter dated June 25, 2001 just two days later. Amtrak's then President George D. Warrington apologized that the service Plaintiffs' received did not meet their expectations, and expressly thanked Mrs. Cannon for providing Amtrak "with valuable information that will allow us to improve."[38] He enclosed a certificate equal to the full value of their trip in the hope that Plaintiffs would give Amtrak "another try".[39]

Federal law does not require Amtrak to implement any particular type of complaint system. Given these facts, it is impossible for Plaintiffs' to establish that Amtrak's method of handling complaints from disabled passengers is ineffective, as they received an apology, service credit, and written commitment from the company president that their comments would be utilized in an effort to improve service. Certainly, it is not discriminatory. Accordingly, this claim must fail as well.

### 6.  Failure to Properly Train Amtrak Personnel

Finally, Plaintiffs allege that Amtrak violated Title II of the ADA and the Rehabilitation Act "by failing to properly train its personnel to lend assistance to persons with disabilities." See Complaint, ¶¶ 36 and 45. This claim is fatally defective as well. Neither the ADA nor the Rehabilitation Act give rise to a cause of action based upon training or lack thereof. While applicable regulations obligate Amtrak

---

[36] Kelly Decl., Exh. "D", page entitled "Contacting Us To Assist You"; Exh. "L", pages 21, 24.
[37] Kelly Decl., Exh. "M", page 25.
[38] Kelly Decl., Exh. "J".
[39] Id.

and similar entities to "ensure that personnel are trained to proficiency, as appropriate to their duties, so that they ... properly assist and treat individuals with disabilities who use the service in a respectful and courteous way ...," 49 C.F.R. 37.173, language in a regulation cannot "conjure up a private cause of action that has not been authorized by Congress." Alexander v. Sandoval, 532 U.S. 275, 291 (2001).

In any event, Amtrak's in-house training programs and materials fully satisfy applicable federal regulations.  For example, Amtrak distributes a comprehensive yet understandable guide to its employees on assisting customers with disabilities, entitled "How May I Assist You?".[40]  In addition to providing detailed information on assisting passengers such as Plaintiff Kara Cannon with mobility impairments, including how to handle wheelchairs, the employee guide stresses Amtrak's commitment that it "will not . . . discriminate against any otherwise qualified individual with a disability . . . ."[41]  At the same time, however, Amtrak's guide properly reminds employees that they may not "[r]equire an individual with disabilities to accept special services which have not been requested by the customer,"[42] such as ordering  food from the snack car.

Moreover, the viability of any "failure to train" claim necessarily is predicated upon the existence of an underlying discriminatory act resulting from the lack of training. See Wray, 10 F. Supp. 2d at 1040-41 (to establish an ADA or Rehabilitation Act violation, plaintiffs must show that Amtrak committed a discriminatory act against them by reason of their disabilities). As the foregoing discussion conclusively demonstrates, none exists here.

### E.    Because Plaintiffs Cannot Establish that Amtrak Intentionally

---

[40] Kelly Decl., Exh. "M". While Amtrak utilizes other training materials as well,   the "How May I Assist You?" employee  guide is sufficient to satisfy the regulatory requirement.

[41] Kelly Decl., Exh. "M", page 3.

[42] Kelly Decl., Exh. "M", page 3.

**Discriminated Against Them in Any Way, Their
Compensatory Damages Claims Are  Barred as a Matter of Law**

Given the undisputed facts at issue in this action, it is impossible for Plaintiffs to prove that Amtrak intentionally discriminated against them because of Kara's disability . There is simply no basis for a finding of animosity or ill will on Amtrak's part.  Nor is there any evidence to even suggest that Amtrak's actions were deliberately indifferent or exceeded the bounds of ordinary negligence.  At most, Amtrak is guilty of  poor  service.

Accordingly, Plaintiffs' compensatory damages claims are subject to dismissal as a matter of law.  While the Third Circuit has yet to consider the question, the federal Courts of Appeal in other jurisdictions have held that, "a plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination." Delano-Pyle v. Victoria County Texas, 302 F.3d 567, 573 (5th Cir. 2002).  See also Wood v. President and Trustees of Spring Hill College, 978 F.2d 1214, 1219 (11th Cir. 1992) (held: proof of intentional discrimination required to recover compensatory damages under the Rehabilitation Act).[43]

To demonstrate intentional discrimination and thus a right to compensatory damages, several circuits have adopted a "deliberate indifference" standard.  "Deliberate indifference" requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood. Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001) (held: liability for compensatory damages under the Rehabilitation Act requires conduct that is more than negligent and involves an element of deliberateness).  See Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1153

---

[43] Of course, as noted previously and as this Court has recognized, the standards of proof under the ADA and the Rehabilitation Act are the same.  See  Doe v. Montgomery Hospital, 1996 U.S. Dist. LEXIS 18965, 7 Am. Disabilities Cas. (BNA) 121 (E.D. Pa. 1996)

(10th Cir. 1999) (held: entitlement to compensatory damages under the ADA and the Rehabilitation Act requires proof that the defendant has intentionally discriminated against the plaintiff, which "can be inferred from a defendant's deliberate indifference to the strong likelihood that its pursuit of its questioned policies will like result in a violation of federally protected rights."). See also, Lovell v. Chandler, 303 F.3d 1039, 1056 (9th Cir. 2002); Bartlett v. New York Board of Law Examiners, 156 F.3d 321, 331 (2d Cir. 1998); Freydel v. New York Hospital, 242 F.3d 365 (2d Cir. 2000).

It is respectfully submitted that no good reason exists for this Court not to apply well-reasoned precedent from five (5) Circuits and to dismiss Plaintiffs' compensatory damages claims under both the ADA and the Rehabilitation Act with prejudice in their entirety.

> **F.    Recent Supreme Court Precedent Requires Dismissal
> of Plaintiffs' Punitive Damages Claims.**

In Barnes v. Gorman, 536 U.S. 181 (2002), the U.S. Supreme Court held just last summer that punitive damages are not recoverable in private actions brought under either Title II of the ADA or the Rehabilitation Act against public entities. 536 U.S. at 235.

By statute, Amtrak is considered a "public entity" under the ADA. See 42 U.S.C. § 12131(1)(c); 49 C.F.R. § 37.3 ("Public entity means . . . The National Railroad Passenger Corporation (Amtrak) ....") Accordingly, Barnes is controlling here and requires dismissal of Plaintiffs' punitive damages claims with prejudice in their entirety as a matter of law.


## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that Amtrak is entitled to judgment on the pleadings or, alternatively to summary judgment in its favor on Plaintiffs' claims under both Title II of the ADA and the Rehabilitation Act. Accordingly, Amtrak respectfully requests that this Court

dismiss Plaintiffs' claims in their entirety with prejudice.

                              Respectfully submitted,

                              LANDMAN CORSI BALLAINE & FORD P.C.
                              Attorneys for Defendant
                              National Railroad Passenger Corporation


                         By: _____
                              Gerald T. Ford
                              One Gateway Center, Suite 400
                              Newark, New Jersey 07102-5311
                              (973) 623-2700

                              Diane J. Ruccia
                              I.D. No.: 74159
                              LANDMAN CORSI BALLAINE & FORD P.C.
                              Mulberry Atrium
                              3rd Floor
                              2133 Arch Street
                              Philadelphia, PA 19103
                              (215) 561-8540


        Dated:  April 3, 2003