IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Arlene Cannon and
on behalf of her minor daughter
Kara Cannon
v.
National Railroad Passenger Corporation
(Amtrak)

Civil Action 02CV3657

PLAINTIFFS' REPLY TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

COMES NOW, the plaintiffs, by counsel, to reply to Defendant's Motion for Judgment on the Pleadings or, alternatively, for Summary Judgment.

Plaintiffs first note that discovery is not complete in this case and that defendant's Motion contained no affidavits from Amtrak personnel on the facts of this case.

Both plaintiffs have standing in this case. Kara Cannon, the disabled child, has standing in this case because she is a "qualified person with a disability" injured by the defendant. In particular, there is a material fact in dispute between the parties as to whether Kara is "too disabled" to travel on Amtrak. Defendant misunderstands the Complaint to state that Kara can not be moved from one car to another on the train. In fact, Kara can safely be moved when the train is not moving and could have been moved to a car with an accessible restroom during many of its scheduled stops.

Arlene Cannon has standing in this case because she suffered specific, direct and separate injury by defendant's violation of Title II of the ADA and the Rehabilitation Act. Mrs. Cannon, for example, also needs an accessible bathroom so that Kara can be with her

when she goes to the bathroom. Similarly, Mrs. Cannon can not leave Kara in the accessible car and go into another car for food.

Plaintiff's' complaint details the pain and agony that Arlene Canon suffered: she had to repeatedly sit on her knees on the floor of a rocking train to change Kara's diapers, she suffered hunger while her child suffered hunger, she couldn't disembark and reboard the train without her child when the car became insufferably hot, she cried for hours in a complete state of powerlessness while watching her child suffer, she suffered the humiliation from the stares she received from her fellow passengers while having to change the diaper of a thirteen year old girl in public and she felt the pain of knowing, even at that time, that the Amtrak conductors — who should have been helping her and could have so easily helped here — were, at the very least, deliberately indifferent to her plight. These are all injuries that directly stem from the defendant's deliberate indifference or hostility to the rights of a person with disabilities.

Defendant then argues that plaintiffs' claims should be dismissed because "As the undisputed facts conclusively demonstrate, Amtrak satisfied its obligation to Plaintiffs under these statutes to provide a 'reasonable accommodation to its disabled passengers, so that they are not disadvantaged by reason of their disability'". Whether "Amtrak satisfied its obligation to Plaintiffs" involves material facts in dispute.

Defendant also argues that compensatory damages should be disallowed because "There is simply no basis for finding of animosity or ill will on Amtrak's part. Nor is there any evidence to even suggest that Amtrak's action were deliberately indifferent." Plaintiffs disagree because there are material issues of fact in dispute. Even though discovery has not closed, there exists evidence that defendant's employees acted with, at least, deliberate indifference, if not hostile intent, to the rights of the plaintiffs.

Defendant, however, is correct that punitive damages are no longer available for claims involving Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. However, since plaintiffs are also seeking injunctive relief, their case can not be dismissed even if compensatory and punitive damages are not permitted.

## I Material Facts in Dispute

1. Whether Kara Cannon is "too disabled" for her to be a "qualified person with a disability." Arlene Cannon's affidavit refutes that she is and defendant has no medical affidavit to suggest otherwise.

2. Whether Arlene Cannon suffered a specific, direct and separate injury by defendant's violation of Title II of the ADA and the Rehabilitation Act. Arlene Cannon's affidavit details the specific, direct and separate harm she sustained.

3. Whether Amtrak satisfied its obligation to plaintiffs. Arlene Cannon's affidavit and the facts described in the complaint shows that they did not and that Amtrak personnel displayed a deliberate pattern of indifference, if not hostility, to the rights of the plaintiffs.

4. Whether Amtrak personnel displayed, at least, a deliberate indifference or hostile intent to the rights of the plaintiffs so that compensatory damages are available. Arlene Cannon's affidavit and the facts described in the complaint show a deliberate pattern of indifference to the rights of the plaintiffs, if not hostility, to the rights of the plaintiffs.

## II Standing

1. Kara Cannon is a “qualified person with a disability.”

Kara Cannon, is a "qualified person with a disability." Defendant asserts that Kara is in a sense “too disabled” to be allowed to ride on an Amtrak passenger train. Kara, however, doesn’t need an “ambulance” (Defendant's Memorandum at 12) for safe transportation. Kara can safely be moved between train cars *when the train is at rest*.[1] (Arlene Canon affidavit) [“Train Nos. 66 and 99 each make twenty-eight (28) interim stops between Newport News and Boston. (Kelly Decl., Exh. "8".)”] Defendant's Memorandum at 18. Kara can be transported by Amtrak much like a baby can. If an emergency happens, she weighs about 65 pounds and she can be carried off the train if need be. No one expects a baby to be able to escape from a train by herself in case of an emergency. Amtrak doesn’t advertise that babies are forbidden on its trains — quite the opposite.

Even though Kara’s medical records were released to the defendant, no affidavit from a medical professional or medical records has been provided by the defendant to support its claim that Kara is “too disabled” to travel on Amtrak. Defendant misunderstood paragraph 14 of plaintiffs' complaint which dealt with access to the food car.[2] If not being able to change cars while the train is moving is an Amtrak criteria for passengers, then people with mobility or vision impairments or are elderly can not travel on Amtrak. Finally, defendant’s suggestion that Arlene Cannon “elected” (Defendant's Memorandum at 5) not to move from a car with a broken restroom, *that both she and Kara needed to use*, is neither accurate nor

---

[1] As to Amtrak’s concern that Kara can not stay for long periods on a hot day in an unairconditioned car without possible health effects, that issue will be resolved by the success of this case in compelling Amtrak to allow Kara to temporarily get off the train at Union Station. Alternatively, if the case is unsuccessful on this issue, Kara will not use Amtrak to travel on hot days when there are long, unairconditioned stopovers.

[2] Kara couldn’t be moved to a food car during a scheduled stop because Arlene Cannon couldn’t be sure that she could wait on line, obtain food and return to her seat before the train moved again.

plausible. The family didn't move because they were told that there were no other accessible restrooms on the train.

2. Arlene Cannon has standing because she has suffered a specific, direct and separate injury.

Defendant argues that Arlene Cannon does not have standing because she did not suffer a specific, direct and separate injury. While Arlene Cannon is not a "qualified person with a disability," she did suffer specific, direct and separate injuries because the defendant violated Title II of the ADA and the Rehabilitation Act and therefore has Article III standing.

There is probably no other bond as close as the bond between a profoundly disabled child and her mother. Whenever Kara cries, is hungry, scared or needs her diaper changed, her mother must be there to help. On a train, Mrs. Cannon also needs an accessible bathroom so that Kara can be with her when she goes to the bathroom. Similarly, Mrs. Cannon can not leave Kara in the accessible car and go into another car for food. If Kara cries because she is being changed on the floor of a rocking car or becomes sick because it too hot on the train, her mother must spend even more time and effort caring for her.

Plaintiff's' complaint details further pain and agony that Arlene Canon suffered: she had to repeatedly sit on her knees on the floor of a rocking train to change Kara's diapers, she suffered hunger while her child suffered hunger, she couldn't disembark and reboard the train without her child when the car became insufferably hot, she cried for hours in a complete state of powerlessness while watching her child suffer, she suffered the humiliation from the stares she got from her fellow passengers while having to change the diaper of a thirteen year old girl in public and she felt the pain of knowing, even at that time, that the Amtrak conductors — who should have been helping her and could have so easily helped here — were, at the very least, deliberately indifferent to her plight. These are all injuries that

directly stem from the defendant's deliberate indifference of the rights of a person with disabilities, if not hostility, to the rights of such persons.

Unlike the cases cited by the defendant (Sinienson v. Hoffman, 1995 US. Dist. LEXIS 15777, 1995 WL 631804 (ND. III. 1995) and Glass v. Hillsboro School District, 142 F. Supp. 2d 1286, 1289, 1292 (D. Or. 2001)), Arlene Cannon was not traveling on Amtrak solely for Kara's benefit. The family was traveling to visit relatives where Arlene could enjoy seeing her family. Because of her Amtrak experience, she hasn't made any train trips to see her relatives again. She can't risk finding herself again on a train without a working accessible bathroom and no one to help her move to a different car. She can't risk traveling on a train where the conductors will not give her a menu, might refuse to bring her food or might not help her with getting Kara on and off the train because they once more could falsely claim that they are "too busy." Consequently, Arlene's last trip to Massachusetts required a more expensive airline ticket and she had to leave Kara at home which required great efforts to make sure that Kara would be taken cared of.

## III Plaintiffs did experience discrimination because of the hostile intent or the deliberate indifference of Amtrak personnel to Kara Cannon's disability.

Defendant argues that plaintiffs claims should be dismissed because "As the undisputed facts conclusively demonstrate, Amtrak satisfied its obligation to Plaintiffs under these statutes to provide a 'reasonable accommodation to its disabled passengers, so that they are not disadvantaged by reason of their disability'" (Defendant's Memorandum at 14). Furthermore, compensatory damages should be disallowed because "There is simply no basis for finding of animosity or ill will on Amtrak's part. Nor is there any evidence to even suggest

that Amtrak's action were deliberately indifferent" (Defendant's Memorandum at 22). The complaint sets forth a long and detailed pattern of Amtrak's failure to provide reasonable accommodations as well as other instances on the trip demonstrating, at least, a deliberate indifference.

In fact, a jury will likely find that there is a *pattern* for Amtrak personnel, who apparently felt the minimal requirements of the ADA and the Rehabilitation Act to be "too burdensome" of their time and made excuses or lies in order to avoid providing the plaintiffs with reasonable accommodations. Either total indifference towards providing reasonable accommodations or an outright effort to discourage travel by persons with disabilities motivated: (1) the reservation clerk and the conductors on the train to never forward Arlene Cannon's repeated requests to temporarily leave the train to Union Station personnel, (2) the conductors on the train and the redcaps at Union Stations to not assist Kara temporarily leave the train at Union Station, (3) conductors who falsely told Arlene Cannon that there were no other accessible restrooms on the train and never told her food could be brought to her, (4) why the only record in Amtrak's elaborate, computerized passenger complaint system is a message made by Mrs. Cannon after the return leg of her trip that she would seek legal counsel (defense exhibit K) and why no record exists of her first telephone complaint which she made after her initial northbound trip.

Defendant's memorandum attempts to explain why Amtrak was not at fault or why any possible service failure does not constitute disability discrimination. First, it should be pointed out, defendant provides no affidavits from any of its employees to substantiate any of the factual statements made by its counsel. Second, the further we look at each service failure, the clearer it becomes that there existed a pattern and practice of deliberate indifference or hostility to the disability rights of the plaintiffs even without the conclusion of discovery.

Plaintiffs' complaint details specific acts of the defendant's personnel which violate specific statutes and regulations that constitute "per se" violations. Those specific acts which are not by themselves "per se" violations of law are part of a pattern that constitutes a pattern of discrimination prohibited by the general prohibition of Title II of the ADA (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act forbidding discrimination against persons with disabilities.

The Department of Transportation promulgated Part 37 of Title 49 of the Code of Federal Regulations so as to implement Titles II and III of the Americans with Disabilities Act (49 CFR § 37.1) and these regulations are applicable to the defendant via 49 CFR § 37.21. Authority for DOT to issue these regulations and establish specific standards of defendant's duties is found in 42 U.S.C. § 12149. In addition, 49 CFR § 37.21(b) also states:

> For entities receiving Federal financial assistance from the Department of Transportation, compliance with applicable requirements of this part is a condition of compliance with section 504 of the Rehabilitation Act of 1973 and of receiving financial assistance.

Specific standards were expressly promulgated by DOT because of the unique nature of disability discrimination: A train without an accessible restroom is just as closed off to a person with a mobility impairment as a train having a sign saying persons with mobility impairments can not ride.

Defendant's reliance on Alexander v. Sandoval, 532 U.S. 275 (2001) is misplaced since the holding in that case was premised on violation of regulations broader in scope than the statutory language. Defendant has not argued that DOT regulations in this case contain language which go past the scope of the statutory language of Title II of the ADA and the Rehabilitation Act except possibly to simply state that training is not a per se violation. Defendant's Memorandum at 21. A Court must give substantial deference to DOT

regulations since the department regulates passenger transportation and is the successor to the Interstate Commerce Commission which regulated train transportation for over a hundred years. Furthermore, Congress required that these regulations be "consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board" (42 U.S.C. § 12149) which has been developing standards and regulations to ensure access to persons with disabilities for about 30 years. Broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991). Thomas Jefferson Univ. v Shalala, 512 U.S. 504, 512 (1994)

1. Defendant had a duty to provide an accessible restroom and take reasonable steps to accommodate persons with disabilities if the restroom goes out of order.

This lawsuit wasn't brought because a toilet broke. Suit was brought because the defendant had a statutory duty to have an accessible toilet (42 U.S.C. § 12162) and when the toilet broke, the defendant had a specific duty to take corrective action. In this case, the simplest thing would have been to tell Mrs. Cannon that there were other accessible restrooms on the train. Amtrak personnel should have helped Mrs. Cannon move to a different car. While defendant's memorandum (bottom of page 14 and top of page 15) now specifically states that there were four other cars with accessible restrooms, Amtrak personnel on the train told Mrs. Cannon there were no other cars with accessible restrooms and seating.

49 CFR § 38.111 and § 38.123 place a specific duty on the defendant to have and maintain accessible features like an accessible restroom. Furthermore, 49 CFR § 37.161(b)

makes clear, that the defendant had a duty to take reasonable steps to accommodate the Cannon's after the defendant closed the only accessible bathroom in their car.

> § 37.161 Maintenance of accessible features:
>
> General.
>
> (a) Public and private entities providing transportation services shall maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities. These features include, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and systems to facilitate communications with persons with impaired vision or hearing.
>
> (b) Accessibility features shall be repaired promptly if they are damaged or out of order. *When an accessibility feature is out of order, the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature. (emphasis added)*
>
> (c) This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

Defendant had a whole host of reasonable options available that involved little effort or cost on its part when the accessible restroom by the Cannons was locked. First, Mrs. Cannon asked to be moved to a different car where there was an accessible bathroom. The conductor who closed the restroom in her car told her that were no other accessible restrooms on the train.[3] Kara could have moved when the train made its next stop. Second, the conductor could have done, as Mrs. Cannon had begged, to not lock the restroom door and simply place a sign to indicate that the toilet was broken and not to be used. Third, considering the Cannon's obvious dire circumstances created by Amtrak's mechanical problems, the

[3] Mrs. Cannon didn't know there were other accessible seating and restrooms on the train. She repeatedly begged the conductor who closed the restroom to be moved to a proper location and her dilemma was readily apparent to all the other conductors who watched her change a diaper on a 13 year old girl on the floor of a rolling car. The suggestion that she "elected" (Defendant's Memorandum at 5) not to move from a car with a broken restroom that she and Kara both needed to use is neither accurate nor plausible.

conductor might have suggested that Amtrak would make arrangements for her to travel on the next train.

Defendant's reliance on Wray v. National Railroad Passenger Corp., 10 F. Supp. 2d 1036 (ED Wis. 1998) for support is misplaced. First, the Court in Wray, id. had a different and much more difficult issue of allocation of scarce resources between competing persons with disabilities:

> the question is: does the ADA grant plaintiffs a right to sit in the disabled seating section, notwithstanding that they did not have reservations and that there were more disabled passengers than there were available seats? This court's answer to that question is "no." Wray id. at 1040

Here, defendant admits (Defendant's Memorandum, pages 14 to 15) that there existed four other cars with accessible seating and restrooms.

Second, compliance with 42 U.S.C. § 12162 "one car per train rule" does not mean that defendant has fully complied with Title II and the Rehabilitation Act of 1973.[4] There are many other specific requirements and regulations that Amtrak must comply with. The "one car per train rule" was enacted to insure that Amtrak would obtain at least one accessible vehicle by July 26, 1995. However, 42 U.S.C. § 12162(a)(2), for example, requires Amtrak to have additional accessible restrooms on new equipment. It would hardly have made sense for Congress to have required Amtrak to continue purchasing trains with accessible restrooms (beyond the "one car per train rule") and not mean that these new trains should be made available to persons with disabilities.

Thus, unlike Wray, id. there were clear alternative means to accommodate the plaintiffs. Amtrak's failure to "take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature" (49 CFR § § 37.161(b)) — even to just tell her that

[4] Defendant argues "it is undisputed that Amtrak more than fully complied with the "one car per train rule", which is dispositive of the claim." Defendant's Memorandum at 14 It is unclear whether defendant really means to say that even with a broken accessible restroom satisfies its complete legal obligation.

there existed other accessible restrooms on the train — discloses, at least, a level of "deliberate indifference" to a crying and pleading mother with a disabled child. Conductors who for hours did nothing to correct or help with this, while watching Mrs. Cannon change a diaper on a rocking floor while passengers stepped over Kara, is evidence of an attitude by the conductors that they didn't want to assist disabled passengers. They were sending a message to everyone on that train that disabled persons weren't wanted and shouldn't ride.

2. Defendant had a duty to tell persons with a mobility impairment that food could be purchased and brought to their seat and to tell them what food was available.

Plaintiffs didn't bring suit because the defendant wouldn't heat up a bottle of baby food. Plaintiffs brought suit because they had indicated they were hungry and the defendant offered no assistance and showed a "deliberate indifference" to plaintiff's hunger. The defendant could have assisted the plaintiffs by simply asking (as their own training manual is entitled and points out) "How May I Assist You." (Defense Exhibit M)

For now, we will assume that FDA regulations do prohibit heating up a bottle of baby cereal. But was there any reason not to tell Mrs. Cannon that Amtrak could provide her with, for example, a cup of hot water that she could then mix with her baby cereal? When a conductor tells a disabled person that one type of food service is not available, the conductor knows that food service is of some concern (especially on a 14 hour train trip) and since there was no sign stating that food services were available for persons with mobility impairment at their seat, the conductor should have explained, as a reasonable accommodation to a person with a small child in a wheelchair, that food could be brought to her seat.[5]

42 U.S.C. § 12162(a)(4)(A)(ii) and 49 CFR § 37.91(e) required Amtrak to provide "equivalent food service" to persons with disabilities.

---

[5] Having a large web site where one page contains information that food can be brought to wheelchair users is hardly effective notice.

> (ii) appropriate auxiliary aids and services, including a hard surface on which to eat, shall be provided to ensure that other equivalent food service is available to individuals with disabilities, including individuals who use wheelchairs, and to passengers traveling with such individuals. 42 U.S.C. § 12162

Defense counsel argues that since "there are no individual snack menus for any passenger" (Defendant's Memorandum, at 16) there is no obligation to provide any menu to mobility impaired passengers who can not travel to the food car. However, there is a very large sign in the snack car listing products and prices and "equivalent food service" requires some notice of availability of specific food products for persons who can not get to the food car.

It would not have been a burden on the defendant to have prepared a list of food products and prices on a sheet of paper in order to provide "equivalent food service." Not having some kind of menu after more than twelve years after the passage of Title II of the ADA shows defendant's deliberate indifference to persons with disabilities. The lack of a sign and the nondisclosure by conductors to Mrs. Cannon that food could be purchased and brought to persons with disabilities reveals that Amtrak doesn't want to publicize a service which would encourage more persons with disabilities to ride its trains and request this service. If Amtrak is going to have a sign in its food car telling people that food is available and what food is available, then Amtrak needs to have an equivalent means of telling persons with disabilities the same thing.

3. Plaintiffs had a clear right to disembark and reboard at Union Station under 49 CFR § 167(g) and should have been accommodated.

Defendant selectively quotes 49 CFR § 37.167(g) when counsel states: "Federal regulations promulgated under the ADA exempt entities such as Amtrak from having to assist passengers in wheelchairs to disembark 'when the lift cannot be deployed.'"

Defendant's Memorandum at 18. The more complete and relevant parts of the regulation are as follows:

> § 37.167 Other service requirements.
>
> (g) The entity shall not refuse to permit a passenger who uses a lift to disembark from a vehicle at any designated stop, unless the lift cannot be deployed, the lift will be damaged if it is deployed, or temporary conditions at the stop, not under the control of the entity, preclude the safe use of the stop by all passengers ...
>
> ... (i) *The entity shall ensure that adequate time is provided to allow individuals with disabilities to complete boarding or disembarking from the vehicle. (emphasis down)*

First, 49 CFR § 37.167 is not about "exemptions." The purpose of 49 CFR § § 37.167 is to specify the service requirement which is at the heart of Title II of the ADA for Amtrak — that persons with disabilities can get on and off Amtrak trains.

Amtrak would like to interpret the phrase "the lift cannot be deployed" as giving it some right to unilaterally decide when a lift cannot be deployed. Considering the language of 49 CFR § § 37.167(i) concerning time and the language of 49 CFR § § 167(g), the phrase "the lift cannot be deployed" clearly refers to some physical problem or impossibility of deploying the lift.

Since Defendant's northbound train stopped for 32 minutes at Union Station[6] and Mrs. Cannon had provided two weeks notice of her need to disembark and reboard at Union Station, defendant has no excuse for not providing this reasonable accommodation.[7] The complaint is very clear that that redcap's refusal to help Kara get off the train on the north-bound leg of the trip was specious. First, he said that the lift was needed elsewhere and then

[6] Per defendant's Exhibit B.

[7] Mrs. Cannon requested this reasonable accommodation on both legs of her trip when (a) she made her reservations two weeks earlier, when she first boarded the northbound train and (c) several more times before reaching Union Station. In addition, she called Amtrak's complaint number between northbound and southbound legs of her trip to complain that she wasn't allowed to disembark and reboard at Union Station on the northbound leg.

he departs without taking the lift he supposedly needed.[8] Complaint ¶¶ 10 - 12. On the southbound leg of the trip, the redcap at Union Station told her that no lift was available even though she directly pointed out a lift to the redcap. Complaint ¶25. Clearly, there is a dispute about the material facts on this issue.

Furthermore, if defendant does take the position that disabled passengers will not be allowed to disembark and reboard during stops, it should make this policy known to passengers instead of having them make futile requests. Recently received documents from Amtrak reveals that reservation clerks have the capability of noting requests for accommodation and electronically transmitting those requests to operating personnel. Since defendant did not produce any document showing Mrs. Cannon's request for assistance at Union Station, it could be presumed for the purpose of defendant's motions that the reservation clerk never typed up any accommodation request and gave a false assurance to Mrs. Cannon that arrangements were being made for her assistance at Union Station.

Violating 49 CFR § § 37.167(g) can be considered as proof of "deliberate indifference" and a per se violation. When reservation clerks, conductors and redcaps all act to conceal and deceive the persons they are supposed to help, we have evidence of a pattern of deliberate indifference and intentional violation of the ADA and the Rehabilitation Act.

4. Defendant had an obligation to not overbook accessible seating and to take reasonable steps to accommodate disabled passengers if overbooking occurs.

Defendant does not appear to understand the necessity of companion seating: If Mrs. Cannon can not travel with both of her young children near her, then Kara and her brother can not travel on Amtrak. The defendant has a computer reservation system. No doubt,

[8] Nor did the conductor, whose job description includes helping board and leave the train, that spoke to the red cap use the lift to help Kara.

ongoing discovery will show that overbooking is a concern for the defendant in its normal operation[9] and they have mechanisms for preventing overbooking if they choose to use them.

In this case, the overbooking that occurred shows that defendant has not taken sufficient steps to prevent overbooking of companion seating. Overbooking, by itself, is not a per se violation of the ADA or the Rehabilitation Act, but it is evidence of a pattern of indifference and violates the general prohibition against discrimination of Title II of the ADA (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act.

### 5. Persons with disabilities need a valid complaint procedure.

To meet the needs of disabled persons Amtrak, like any other large business, needs a complaint procedure to identify problems and deficiencies. "Driving blind" is not a way to manage a business; "driving blind" only indicates that you don't care about what you are doing. It is evidence of a pattern of indifference and violates the general prohibition against discrimination of Title II of the ADA (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act.

In this case, Mrs. Cannon first complained by phone at the end of her initial northbound trip that she had not been allowed to disembark and reboard at Union Station. That complaint didn't help her any on her return trip. At the end of her southbound trip, she complained again by phone. Both times she was told that a detailed follow up would be made of her complaints. Both times she never saw any specific interest by the defendant in following up. An intricate bureaucratic complaint structure doesn't do any good if it is only designed to make complaints a futile gesture.

---

[9] Of course, overbooking for persons without disabilities only results in their having to stand. Overbooking for persons with disabilities can prevent travel.

A form letter, supposedly signed by the President of the company, that states "I apologize that the service did not meet your expectations or the level of service that we strive toward every day" is not an acknowledgment that Amtrak did anything wrong. The form letter without a detailed follow up reasonably conveys that Amtrak doesn't really want to hear anything more and it is futile to keep trying.

6. Amtrak's personnel need training so that persons with disabilities receive reasonable accommodations.

Defendant cites 49 CFR § 37.173 and states that "Amtrak's in-house training programs and materials fully satisfy applicable federal regulations." Defendant's Memorandum at 21 The regulation is as follows:

> Each public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.

The plaintiffs agree that a "failure to train" is not a per se violation of the ADA and the Rehabilitation Act of 1973 since a "failure to train" is, in effect, only a repetition of the previous matters discussed. That is, if the defendant is correct that Amtrak provided the Cannons with all the services they were required to provide under the law, then, under the regulation, Amtrak provided all the needed training. On the other hand, if Amtrak didn't provide the Cannons with all the services they were required to provide, then, under the regulation, there wasn't sufficient training.

## IV Remedies: Even without compensatory or punitive damages this case not be dismissed because injunctive relief is sought.

Defendant is correct that punitive damages are not available. The controlling law on this issue was decided just as we were filing suit. If the Court deems it necessary, we ask for leave to amend the complaint to withdraw a claim for punitive damages and make any other modifications the Court deems necessary.

Part III of this reply responded to the issue of the availability of compensatory damages. We are certain that a jury will find that the defendant treated the plaintiffs with, at least, deliberate indifference to their rights if not outright hostility one time after another. But one final general point has to be made because it appears that the defendant believes that it takes a disparaging comment or a physical attack to show "ill-will" or personal animosity towards persons with disabilities.

The history of various forms of discrimination in this country is a painful memory which many would like to forget. But it needs to be remembered that a really great part of the discrimination that happened in this country was motivated primarily by money and stereotypes. Housing was segregated because many feared that property values would be lessened if African Americans lived in their neighborhood. Employment discrimination was strengthened by the fear that minorities would work for much lower pay and take away jobs from others.

Disability discrimination legislation (such as the Air Access Act, the Rehabilitation Act, the ADA, and the Architectural Barriers Act) were enacted because (1) Congress understood that a step in front of a home or restaurant was a barrier to access just as much as sign that said "Whites Only", and (2) that barriers existed because businesses didn't want to spend money removing barriers or change the way they operated because of stereotypes about disabled persons — namely that persons with disabilities aren't profitable customers.

Amtrak requests billions of dollars from taxpayers on the basis that they provide a service to the American people that needs to be subsidized. Millions of disabled American

taxpayers contribute to this subsidy. Denying facilities and services to persons with disabilities because of a stereotype is just as much "ill-will" as making derogatory remarks.

> One of the undoubted achievements of statutes designed to assist those with impairments is that citizens have an incentive, flowing from a legal duty, to develop a better understanding, a more decent perspective, for accepting persons with impairments or disabilities into the larger society. The law works this way because the law can be a teacher. So I do not doubt that the Americans with Disabilities Act of 1990 will be a milestone on the path to a more decent, tolerant, progressive society. Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 375 (2001)

Finally, even if compensatory damages are not permissible herein, the plaintiffs have prayed for injunctive relief so they can use Amtrak in the future. Consequently, this case can not be dismissed without such an adjudication even if damages are not available. It needs to be made clear to Amtrak that Mrs. Cannon and her family have (1) a right to be moved if the accessible restroom in their car is broken and there are other cars which have accessible seating and accessible restrooms or can be made accessible, (2) provide a current menu of food items to Mrs. Cannon when she travels so that she knows what is available, (3) that when advance reservations are made she will receive assistance to disembark and reboard her train, and (4) that Amtrak will install safeguards to prevent overbooking of accessible seating.

## CONCLUSION

For all the foregoing reasons, it is respectfully submitted that Amtrak's motions be denied with the exception that plaintiffs have leave to amend their complaint to withdraw their claim for punitive damages.

Respectfully submitted,

___/s/ Barry Weintraub_
Barry Weintraub
32 Hayes St.
Stafford, VA 22556
540-658-9980 voice
540-658-9981 fax
Co-counsel for Plaintiffs

__/s/Anthony Brady________
Anthony Brady
P.O. Box 649
Camden, NJ 08101
856-541-1930
856-541-1966 fax

## Certificate of Service

I, Barry Weintraub, certify that a copy of the foregoing reply and attachments has been sent by first class mail to defendant's counsel: Mr. Gerald T. Ford, Landman Corsi Ballaine & Ford, P.C., One Gateway Center, Suite 400, Newark, NJ 07102 this April 29, 2003.

_______/s/ Barry Weintraub__________