UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ARLENE CANNON, and on behalf of her minor daughter KARA CANNON,<br><br>    Plaintiffs,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION (a/k/a AMTRAK),<br><br>    Defendant. | CIVIL ACTION NO.:<br>02-CV-3657<br><br>The Honorable James McGirr Kelly |

**DEFENDANT AMTRAK'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

**Introduction**

Plaintiffs concede that their punitive damages claim is subject to immediate dismissal as a matter of law.[1] Moreover, Plaintiffs' Opposition confirms that Amtrak remains entitled to judgment on the pleadings or, alternatively, to summary judgment in its favor on their disability discrimination claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, et seq.,

---

[1] See Plaintiffs' Reply to Defendant's Motion for Judgment on the Pleadings or Alternatively, for Summary Judgment, hereinafter "Opposition", at 3.

283965.1 DocsNJ

and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Indeed, Plaintiffs cannot avoid the entry of judgment against them by protesting that discovery is not complete when the factual statements upon which Amtrak's Motion is based come from their own Complaint, confirmed by sworn discovery responses.[2] Nor can they create material issues of fact to preclude summary judgment by concocting a new, improved story in contravention of their own prior sworn statements.

### A. Despite Her Protestations of Pain and Agony and the Bond Between Mother and Child, Plaintiffs' Opposition Confirms that Arlene Cannon Suffered No Specific, Direct or Separate Injury from Her Disabled Daughter and Thus Lacks Standing to Sue.

Plaintiffs' heart-felt descriptions of Arlene Cannon's feelings for her child confirm that she did not suffer any separate injury from that allegedly sustained by her disabled daughter, Kara:

> "[S]he suffered hunger while her child suffered hunger, she couldn't disembark and reboard the train without her child when the car became insufferably hot, **she cried for hours** in a complete state of powerlessness **while watching her child suffer** . . . ." (Opposition, at 2, 5.) (Emphasis added.)

Indeed, Mrs. Cannon only sought to have personal food warmed up for Kara. She never sought food for herself or her nondisabled son, Kenneth, or claimed that they were hungry while on the train. (Complaint, ¶ 14.) Similarly, the only reason Mrs. Cannon needed to detrain in Washington Union Station was Kara's alleged breathing problems and susceptibility to seizures. (Complaint, ¶ 8.)

Plaintiffs surprisingly assert that Mrs. Cannon suffered separate injury because she "also needs an accessible bathroom so that Kara can be with her when she goes to the bathroom." (Opposition, at 1-2, 5.) Then, in her affidavit, Mrs. Cannon candidly admits for the first time that she visited the bathroom alone on the train several times, without Kara. (Affidavit of Arlene

---

[2] See Plaintiffs' Answers to Defendant's First Set of Interrogatories, attached as Exhibit A to Declaration of Raquel Fruchter.

Cannon, hereinafter "Cannon Aff.", ¶ 5.) Simply stated, Mrs. Cannon own sworn statements confirm that she needs an accessible restroom only for Kara and not for herself.

Finally, Plaintiffs contend that Mrs. Cannon suffered a separate injury because her Amtrak experience has prevented her from seeing her relatives again, something she enjoys. (Opposition, at 6.) Once again, according to Mrs. Cannon's own affidavit, she now flies to Massachusetts to see her relatives and has made the plane trip at least once since traveling on Amtrak, without Kara. (Cannon Aff., para. 5.) Thus, no separate injury occurred and Plaintiffs' attempt to distinguish the authorities on standing cited by Amtrak on this ground remains singularly unconvincing. (Opposition, at 6.)

Accordingly, Mrs. Cannon's individual claims remain subject to dismissal as a matter of law for lack of standing. Indeed, her assertions that she will never take the train again further preclude Plaintiffs from establishing that they have standing to seek injunctive relief in this action, as discussed more fully, <u>infra</u>.

> **B. Plaintiffs Cannot Avoid a Finding That Kara Cannon Is Not a Qualified Individual With a Disability by Contradicting Their Own <u>Sworn Statements About Her Fragile Health Condition</u>.**

In their Complaint, Plaintiffs allege that Kara Cannon suffers from severe mobility, vision, speech and cognitive disabilities that confine her to a wheelchair: "[s]he is very tiny and her bones are very fragile." (Complaint, ¶ 6.) Specifically, Plaintiffs assert in their Complaint that "**there was no safe way** to transport Kara in her chair between [train] cars", even if only into the next car ahead, "because Kara's bones are very small and fragile." (Complaint, ¶ 14.) (Emphasis added.) In addition, Plaintiffs represent that Kara cannot go without air conditioning for more than 40 minutes without risking seizures and breathing problems. (Complaint, ¶ 8.) When asked to "set forth in

detail" the factual basis for these claims in answers to interrogatories, Plaintiffs responded under oath that "[t]hose details are presented in the Complaint." [3] No further factual information was forthcoming.

Yet now, when faced with dismissal of their claims based on Kara's apparent inability to travel safely on the train, given her much touted physical limitations,[4] Plaintiffs for the first time surprisingly assert, once again under oath, that:

"In fact, Kara **can safely be moved** [from one car to another] when the

train is not moving. . . ." (Opposition, at 1.)

"Kara can safely be moved between train cars *when the train is at rest*."

(Opposition, at 4. See, Cannon Aff., ¶ 2.)

Rather than provide any explanation for the dramatic change in their story, however, Plaintiffs incredibly blame Amtrak for "misunderstanding" the Complaint. (Opposition, at 1, 4.)

Of course, Plaintiffs cannot avoid summary judgment on their claims by concocting new and better facts that conflict with their own prior sworn statements. Where, as here, a nonmovant's affidavit contradicts earlier sworn statements without a satisfactory explanation, the courts within this jurisdiction have not hesitated to disregard the conflicting affidavit in determining whether a genuine issue of material fact exists. See, e.g., Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991) (summary judgment affirmed despite plaintiff's affidavit that conflicted with prior deposition

---

[3] See Plaintiffs' Answers to Defendant's First Set of Interrogatories, attached hereto, Answers to Interrogatory Nos. 15 - 17, 23.

[4] Contrary to Plaintiffs' apparent suggestion that Amtrak's Motion is deficient because the Company did not provide further medical documentation as to Kara's limitations (Opposition, at 4), the Company permissibly relied upon Plaintiffs' own sworn statements concerning her physical condition, as alleged in the Complaint and confirmed by Plaintiffs' Answers to Interrogatories.

testimony); Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) (summary judgment affirmed : plaintiff's affidavit properly disregarded as flatly contradicting prior sworn statements in deposition and answers to interrogatories). "The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit."Martin v. Merrell Dow, 851 F.2d at 706.  See also, Blackburn v. United Parcel Serv., Inc., 3 F. Supp. 2d 504, 516 n.10 (D.N.J. 1998), aff'd, 179 F.3d 81 (3d Cir. 1999) (summary judgment for employer: conflicting affidavit disregarded and statements in brief based thereon not considered). Accordingly, Plaintiffs are bound by their sworn statements that Kara cannot be safely transported between train cars.

Moreover, even if Kara could be carried off the train in an emergency without damage to her fragile bones "much like a baby can" if the train is stopped, [5] it remains undisputed that Amtrak trains sometimes lose heat or air conditioning en route, something Plaintiffs have chosen to ignore. Instead, they suggest that Kara can simply "get off the train" if the air conditioning goes off at a scheduled stop or avoid train travel "on hot days when there are long, unairconditioned stopovers.(Opposition, at 4n1.)  According to Plaintiffs' own representations concerning her health, however, this leaves Kara at risk of a seizure or breathing difficulties if the air conditioning goes off unexpectedly while the train is running between stops.  This is a risk Amtrak cannot and should not be forced to assume.

Indeed, for this exact reason, neither the ADA nor the Rehabilitation Act require Amtrak to transport any disabled passenger who does not "meet the essential eligibility requirements" for train travel. See 42 U.S.C. § 12131(2).  Plaintiffs' claims thus remain subject to dismissal as they cannot

---

[5] Opposition, at 4.

establish that Kara Cannon is a "qualified individual with a disability" entitled to protection under either statute. See, e.g., Easley v. Snider, 36 F.3d 297, 300 (3d Cir. 1994) (under both ADA and the Rehabilitation Act, held: disabled plaintiffs ineligible for participation in program designed to enable physically disabled persons to live in their homes rather than institutions due to inability to satisfy requirement that they be mentally alert.)

### C. Plaintiffs' Opposition Now Confirms That They Cannot Satisfy Their Burden of Proving That Amtrak Violated Either the ADA Or the Rehabilitation Act, and Their Resulting Inability to Prove Intentional Discrimination Bars Their Recovery of Compensatory Damages As a Matter of Law.

In a singularly unpersuasive attempt to avoid dismissal, Plaintiffs simply have changed their story. Yet, none of their newly created facts or arguments establish an actionable claim. Plaintiffs remain bound by their prior sworn factual statements, which confirm that Amtrak fully satisfied its duty to reasonably accommodate Kara Cannon's allegedly protected disability under both the ADA and the Rehabilitation Act.[6]

Moreover, given their apparent acknowledgment that a showing of intentional discrimination constitutes a condition precedent to the recovery of compensatory damages under both the ADA and the Rehabilitation Act,[7] and Amtrak at most is guilty of poor service, Plaintiffs' compensatory damages claims remain barred as a matter of law.[8]

---

[6] As emphasized in Amtrak's initial Memorandum, the substantive standards for determining liability under the ADA and the Rehabilitation Act are the same. See Amtraks' Memorandum, at 13n21, and authorities cited therein.

[7] Opposition, at 18-19. See Amtrak's Memorandum at pages 22-23.

[8] Of course, Plaintiffs' assertion that Amtrak did not provide affidavits from any of its employees to substantiate the factual statements contained in its Memorandum (Opposition, at 7) warrants little time or attention for several reasons. First, the statement is simply wrong, in that

### 1. **The Alleged Denial of an Accessible Restroom.**

It remains undisputed that Amtrak more than complied with the "one car per train" rule by providing five (5) accessible cars on Train No. 99 the day of Plaintiffs' trip, including five (5) wheelchair accessible restrooms, which more than compensated for the one nonfunctioning toilet. Indeed, one of the working accessible restrooms was located in the snack car immediately adjacent to the Plaintiffs' car.[9] Since Mrs. Cannon now acknowledges that she left Kara to use the bathroom on more than one occasion,[10] she certainly had reason to know that there was an accessible restroom in the very next car.

Despite Plaintiffs' attempt to circumvent established precedent, Amtrak thus is deemed in compliance with the ADA with respect to providing accessible accommodations, including restrooms, for disabled passengers. See Wray v. National Railroad Passenger Corporation, 10 F.Supp.2d 1036, 1039 (E.D. Wis. 1998) (summary judgment granted for Amtrak on passengers' ADA claims). Moreover, Plaintiffs admit that Amtrak closed the accessible restroom in their train car because the toilet was broken,[11] and for no other reason. Thus, as Plaintiffs themselves assert,

---

Amtrak submitted the sworn Declaration of Amtrak employee Eliza F. Kelly in support of the pending Motion, together with relevant documents that Ms. Kelly appropriately authenticated. Second, Plaintiffs decline to identify even one of the factual representations they claim are unsupported by the record. Third, as the accompanying record citations confirm, the vast majority of the factual statements contained in Amtrak's Memorandum are based upon Plaintiffs' own allegations as they appear in the Complaint, and as confirmed by their sworn discovery responses.

[9] The train consist documents and diagrams for Train No. 99 on June 23, 2001, attached as Exhibit "H" to the Declaration of Eliza F. Kelly, confirm these facts.

[10] Cannon Aff., ¶ 5.

[11] Opposition, at 11.

"the Cannon's obvious dire circumstances [were] created by Amtrak's mechanical problems"[12] and not any intent to deny restroom access to disabled passengers. This admission is dispositive of their accessible bathroom claim. See Wray, 10 F. Supp.2d at 1039 (to establish an ADA violation, plaintiffs must show not only a discriminatory act but also that the act was committed with a motive or intent to discriminate based on their disabilities.)

In any event, the only accessible feature of the accessible bathroom that Plaintiffs utilized was the doorway. It remains undisputed that Kara did not use the accessible toilet, but instead had her diapers changed laying on the bathroom floor. (Complaint, ¶ 17.) Thus, even in the accessible restroom, Mrs. Cannon changed Kara's diapers "on the floor of a rocking train." [13]

To avoid summary judgment on these undisputed facts, Plaintiffs now for the first time assert under oath that: 1) the conductor who closed the restroom falsely told Mrs. Cannon there were no other accessible restrooms on the train to which they could move; [14] and 2) "Kara can safely be moved between train cars *when the train is at rest*."[15] Previously, in their own Complaint, confirmed as a full, accurate and detailed account of the factual basis for their claims in their sworn discovery responses, Plaintiffs had insisted that: 1) "there was no safe way to transport Kara in her chair between cars; particularly, because Kara's bones are very small and fragile"; and 2) that "the conductor would only keep repeating . . . that he had 'been told' to lock the accessible bathroom."(Complaint, ¶¶ 14, 17.) As discussed at length previously, controlling Third Circuit

---

[12] Opposition, at 11.

[13] Opposition, at 2, 5, 10n3, and 12.

[14] Opposition, at 5, 7, 10; Cannon Aff., ¶ 6.

[15] Opposition, at 4. See also, Opposition, at 1; Cannon Aff., ¶ 2.

authority precludes consideration of these "new and improved" facts, as they conflict with Plaintiffs' prior sworn statements. (See pages 4-5, supra.)

Accordingly, Plaintiffs' accessible restroom allegations fail to state an actionable disability discrimination claim. Quite wisely, Plaintiffs appear to concede that their allegations concerning the lack of blankets or trash removal affected all passengers equally, regardless of disability.

### 2. The Accessible Food Service Claim.

It remains undisputed that neither Mrs. Cannon nor her nondisabled son Kenneth indicated to any Amtrak personnel that they were hungry. The only food-related conversation between Plaintiffs and any Amtrak on-board service employee concerned Mrs. Cannon's request that a container of personal food – baby cereal[16] – be heated for Kara, a request that was rightly declined as prohibited by FDA regulation. (Complaint, ¶ 14.)

Moreover, Mrs. Cannon now candidly admits that she could have taken Kara with her to the fully accessible snack car when the train was stopped.[17] At other times, of course, Plaintiffs have claimed that Kara could not be safely moved between train cars, as discussed previously. Indeed, just pages away in the very same brief, they insist that Mrs. Cannon "cannot leave Kara in the accessible car and go into another car for food." (Opposition, at 2, 5.)

Plaintiffs attempt to finesse this blatant inconsistency by explaining that Kara could not be moved to the food car – which was immediately ahead of the accessible car in which they rode – during a scheduled stop because Mrs. Cannon "couldn't be sure" she would have enough time to

---

[16] Opposition, at 12.

[17] Affidavit of Arlene Cannon, ¶ 8.

wait on line, get the food and return to her seat before the train moved again. (Opposition, at 4 n2.) Of course, Mrs. Cannon could have asked for assistance in obtaining food, a widely publicized service Amtrak is happy to provide disabled passengers. [18] This service includes explaining to the passenger what items are available from the snack bar, so that all passengers, disabled or not, receive equivalent food service. No one gets an individual menu, but they do get the same information. It remains undisputed that she chose not to.

In response to these undisputed facts, Plaintiffs insist that Amtrak "had a duty to tell persons with a mobility impairment that food could be purchased and brought to their seat and to tell them what food was available." (Opposition, at 12.) Contrary to what Plaintiffs suggest, however, the ADA does not require individual menus for the disabled. Certainly, therefore, a lack of menus does not constitute "deliberate indifference" toward the disabled. (Opposition, at 13.)

Moreover, it is reasonable to anticipate that some passengers might consider such an inquiry invasive or paternalistic, in that it assumes a disabled passenger cannot obtain food for themselves unassisted if they so choose from the fully accessible snack car. In any event neither the ADA nor the Rehabilitation Act impose such a duty upon Amtrak. Nor does the law require that Amtrak post a sign to this effect.

It was equally reasonable for Amtrak's employee to assume that because Mrs. Cannon asked only to heat up special food for Kara that Kara could not eat food from the snack bar, that the other Cannons did not want food, and that if they wanted food, they would ask for further assistance. Simply stated, these facts are not probative of intentional discrimination against or deliberate

---

[18] See Declaration of Eliza F. Kelly, hereinafter "Kelly Decl.", Exh. "D", page entitled "Meal Service"; Exh. "L", page 11; Amtrak's Memorandum of Law, at 16.

indifference toward the disabled.

### 3. Plaintiffs' Inability to Detrain and Reboard During a Brief Stop.

Once again, in a desperate attempt to avoid dismissal, Plaintiffs embellish their prior sworn statements, at times adding entirely new facts. Specifically, Plaintiffs assert for the first time that when the train stopped in Washington Union Station on their return trip, Mrs. Cannon was told no lift was available "even though she directly pointed out a lift to the redcap," citing to Paragraph 25 of the Complaint.(Opposition, at 15.) Yet, no such statement appears anywhere in Paragraph 25 or elsewhere in the Complaint or discovery responses from Plaintiffs. As discussed previously, controlling Third Circuit precedent requires that this newly created, wholly unsupported and inflammatory fact be disregarded in ruling on Amtrak's Motion.[19]

Moreover, Plaintiffs' allegations concerning their first interim stop in Union Station at most show that the only recap there explained he was too busy during the brief 32-minute stop to both take Kara off the train and then reboard her because he was needed elsewhere to operate a lift in another location, and that he did not take the lift next to Plaintiffs' train with him. [20] As Amtrak previously emphasized and Plaintiffs do not dispute, time constraints often mean that disabled passengers boarding the train initially or detraining at their final destination must be accorded first priority. [21]

Plaintiffs' interpretation of DOT regulations would require Amtrak to detrain and reboard all disabled passengers at each and every one of the 28 stops Train Nos. 66 and 99 make between

---

[19] See pages 4-5, supra.

[20] Opposition, at 15; Complaint, paras. 11-12.

[21] Amtrak's Memorandum, at 17.

Newport News, Virginia and Plaintiffs' final destination in Massachusetts. As the train schedule reflects, these stops can last as little as eight (8) minutes[22] and multiple disabled passengers may require assistance. Indeed, contrary to Plaintiffs' suggestion that Amtrak keeps disabled passengers in the dark about such service limitations and allows them to make "futile requests" to detrain,[23] the Company's website and other publications expressly inform them that delays may occur "if there are a large number of passengers or a limited staff." [24] As the district court recognized in Wray, when on-board service personnel were required to decide between a group of disabled passengers who needed accessible seating the most, where Amtrak has provided "reasonable response to the problem of excess demand [for accessible services] . . .the ADA does not give plaintiffs a right to override it." 10 F. Supp. 2d at 1039.

Finally, Plaintiffs contend without any evidentiary support whatsoever that because no Company document reflects their alleged requests for assistance in Union Station, "it could be presumed for the purpose of defendant's motions" that Amtrak made false representations to Mrs. Cannon that she would be accommodated, that "reservations clerks, conductors and redcaps all act[ed] t conceal and deceive the persons they are supposed to help", and thus engaged in intentional disability discrimination. (Opposition, at 15.)   Of course, the utter lack of any documentation for Plaintiffs' alleged requests for assistance is equally probative of the conclusion that no such requests were ever made.

### 4. ADA Accessible Seating for Kenneth Cannon, Who Is Not Disabled.

---

[22] Kelly Decl., Exh. "B"

[23] Opposition, at 15.

[24] Kelly Decl., Exhs. "D", page entitled "Our Stations"; Exh. "L", page 4.

It remains undisputed that Plaintiff Arlene Cannon's ten-year old son Kenneth, who is not disabled, was asked to give up his accessible seat for one or two hours only so that another admittedly visibly disabled passenger with a reservation for accessible seating might be accommodated. [25] The same DOT regulations Plaintiffs cite with great fervor when it suits their purpose require that Amtrak "*shall ask*" any nondisabled passenger to move to make room for disabled passengers, although the Company was not required to enforce such a request and made no attempt to do so with Kenneth. See 49 C.F.R. § 37.167(j) (1), (3). Despite unsupported accusations of "overbooking", these points are dispositive of Plaintffs' denial of accessible seating claim under Wray, in which admittedly disabled passengers were lawfully required to move from accessible seating to make room for other more significantly disabled passengers. 10 F. Supp. 2d at 1039.

5. **Alleged Failure to Implement a Complaint System.**

Even though neither the ADA nor the Rehabilitation Act require implementation of a Complaint system, it remains undisputed that Amtrak operates a well-established complaint system for disabled passengers, as described and documented in its opening Memorandum.[26] Indeed, this complaint system works, in that it documented Plaintiff Arlene Cannon's expressed dissatisfaction with their train trip and resulted in Plaintiffs' receipt of a written apology from Amtrak's President, enclosing a travel credit equal to the full value of their three round-trip fares.[27]

Nevertheless, Plaintiffs accuse Amtrak of "driving blind" and express their personal opinion

---

[25] Opposition, at 16; see Complaint, ¶¶ 26-27.

[26] See Amtrak's Memorandum, at pages 19-21; Kelly Decl., Exhs. "D", page entitled "Contacting Us to Assist You"; Exhs. "I", "L", pages 21 and 24, Exh. "M", page 25.

[27] Kelly Decl., Exh. "J".

without factual support that the Company's complaint system is somehow "futile".(Opposition, at 16-17.) It is well established, however, that Plaintiffs' subjective beliefs are insufficient to create a genuine issue of material fact. See, e.g., McMillian v. Sventanoff, 878 F.2d 186, 190 (7th Cir. 1989). Accordingly, this claim remains subject to dismissal.

### 6. Alleged Failure to Train Amtrak Personnel.

Plaintiffs concede that an alleged "failure to train" does not constitute a per se violation of the ADA or the Rehabilitation Act, and that their claim to this effect is "only a repetition of previous matters discussed." (Opposition, at 17.) These fundamental admissions are fatal to Plaintiffs' training claim, and it thus remains subject to dismissal as a matter of law. See Alexander v. Sandoval, 532 U.S. 275, 291 (2001) (held: language in a regulation cannot "conjure up a private cause of action that has not been authorized by Congress.")[28]

### D. Plaintiffs Lack Standing to Sue for Prospective Injunctive Relief Against Amtrak as They Do Not Intend to Travel by Train Again, Nor Have They Shown that Amtrak Is Liable to Discriminate Against Disabled Passengers in the Future.

Plaintiffs recognize quite correctly that the conceded unavailability of punitive damages and their inability to establish intentional discrimination by Amtrak to recover compensatory damages place this lawsuit in danger of dismissal. Nevertheless, Plaintiffs insist that their request for injunctive relief saves the day. (Opposition, at 18.) This argument is belied by Plaintiff Arlene Cannon's own sworn statements that she "cannot travel on an Amtrak train with Kara," and that

---

[28] Indeed, Plaintiffs specifically acknowledge Sandoval's applicablity to their purported failure to train claim. (Opposition, at 8-9.)

they will not do so in the future, despite receipt of a travel credit equal to the full value of their round trip train fare:

> "I will not use it [the travel credit] because of the way they have treated Kara.  I am afraid of how they will treat Kara in the future. If I need to go anywhere, I will fly . . . ." (Affidavit of Arlene Cannon, ¶ 5 .)

In similar circumstances, the federal courts in this jurisdiction and elsewhere have held that plaintiffs lack standing to seek injunctive relief for disability discrimination under either the ADA or the Rehabilitation Act when they have not stated an intention or desire to return to the place where they had previously encountered an ADA violation, or have failed to show a likelihood of disability discrimination should they return to that place. See, e.g., Adelman v. Acme Markets Corp., 1996 U.S. Dist. LEXIS 2119, 5 Am. Disabilities Cas. (BNA) (E.D. Pa. 1996), aff'd in part, vacated in part without opinion, 111 F.3d 125 (3d Cir. 1997); O'Brien v. Werner Bus Lines, 1996 U.S. Dist. LEXIS 2119, 5 Am Disabilities Cas. (BNA) 444 (E.D. Pa. 1996); Disabled in Action of Metropolitan NY vs. Trump International Hotel & Tower, 2003 U.S. Dist. LEXIS 5145 (S.D.N.Y. Apr. 2, 2003); Shotz v. Cates, 256 F.3d 1077, 1082 (11th Cir. 2001); Moreno v. G & M Oil Co., 88 F. Supp. 2d 1116, 1116-17 (C.D. Cal. 2000).

Given Arlene Cannon's vehement sworn statements that she will not take Kara on the train in the future, the general statement in Plaintiffs' brief to the contrary is singularly unpersuasive. (Compare Cannon Aff., ¶ 5 and Opposition, at 19.) Moreover, Plaintiffs have utterly failed to identify even one fact to suggest that discrimination would occur against them in the future, should they change their minds and be willing to give the train another try. Accordingly, Plaintiffs' claim for injunctive relief is subject to dismissal as a matter of law and cannot preserve this action for trial.

**CONCLUSION**

For all of the foregoing reasons, it is respectfully submitted that Amtrak remains entitled to judgment on the pleadings or, alternatively to summary judgment in its favor on Plaintiffs' claims under both Title II of the ADA and the Rehabilitation Act.  Accordingly, Amtrak respectfully requests that this Court dismiss Plaintiffs' claims in their entirety with prejudice and without further delay.

        Respectfully submitted,

        LANDMAN CORSI BALLAINE & FORD P.C.
        Attorneys for Defendant
        National Railroad Passenger Corporation
        ("Amtrak")


By:_____
   Gerald T. Ford
   One Gateway Center, Suite 400
   Newark, New Jersey 07102-5311
   (9730 623-2700

Diane J. Ruccia
I.D. No.: 74159
LANDMAN CORSI BALLAINE & FORD P.C.
Mulberry Atrium
3rd Floor
2133 Arch Street
Philadelphia, PA 19103
(215) 561-8540